In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3052, 99-3677, 99-3937 & 00-1045

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JARRODE E. PHILLIPS, also known as JAKE,
also known as TRIFE, also known as
TRIFLING;
FRANK E. STORK; LAMAR TAYLOR, also known
as BULLET; and JOHN S. WAFFORD, also known
as J. HENDERSON, also known as VIETNAM,

Defendants-Appellants.

Appeals from the United States District
Court
for the Northern District of Indiana,
South Bend Division.
No. 3:98 CR 67--Robert L. Miller, Jr.,
Judge.

Argued May 31, 2000--Decided February 1, 2001

Before FLAUM, Chief Judge, and BAUER and
HARLINGTON WOOD, JR., Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge.
Following jury trials, defendants-
appellants were convicted on numerous
counts relating to their involvement with
the Dawg Life street gang in South Bend,
Indiana, and now appeal.

I.  BACKGROUND

On April 19, 1999, after a three-week
trial, a jury found three of the
defendants guilty as follows: Phillips of
maintaining a place for the purpose of
manufacturing, distributing, or using a
controlled substance, relating to the
crack house at 303 LaPorte Street and the
crack house at 1115 East Indiana Street,
and possessing firearms as a felon; Stork
of committing a violent crime in aid of
racketeering in violation of the

Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. sec.sec. 1961-68, and use of a firearm during a crime of violence; and Taylor of committing a violent crime in aid of racketeering activity in violation of RICO, using a firearm in relation to a violent crime, and helping to maintain a crack house at 1115 East Indiana Street. On October 13, 1999, after a separate two-day jury trial, Wafford was convicted of committing a violent crime in aid of racketeering in violation of RICO, possessing a firearm after having been convicted of a felony, and using a firearm during a crime of violence.

Because both trials contained much of the same testimony and evidence, the background information from the two trials is presented together. As several of the issues concern the sufficiency of the evidence, the facts are set forth in detail.

Testimony showed that Dawg Life began in the early 1990s as the Southeast Side Dogs street gang, operating in specific territory on the southeast side of South Bend, Indiana. The gang was involved in the sale of illegal drugs, particularly cocaine, both on the street and from certain gang-operated crack houses. The price paid to acquirecocaine depended on the amount the member could sell as well as his rank in the gang. The more cocaine a member sold, the lower the price he paid. Certain crack houses were controlled by Dawg Life, with only members allowed to sell drugs from the house.

The lowest-ranking members of Dawg Life were referred to as "Little Locs," with "G. Locs" ("Gangsta Loc") being the next ascending rank. The highest-ranking members were known as "O.G.s" ("Original Gangsta"). There were identifying handshakes for each rank within the gang. The higher-ranking members received more privileges. Lower-ranking members went to higher-ranking members for drugs in order to make money. One of the Little Locs testified that Wafford, an O.G., had suggested the Little Locs pool their money, which they then gave to Wafford until they had a greater amount to purchase cocaine based on the fact that the price was incrementally less when purchased in greater quantities.

Like other gangs, Dawg Life used hand signs to identify themselves as members and to differentiate themselves not only from other gangs but from friendly subgroups which developed within the gang. Two subgroups within Dawg Life were the Dawgy Style Mafia ("D.S.M.") and the Rush ("Ruthless Unstoppable Street Hustlers") Street Gangstas ("R.S.G."). Phillips and Stork were G. Locs in the R.S.G. Taylor was a G. Loc in the D.S.M. Wafford was an O.G. in the D.S.M. Members also identified themselves by wearing the Dawg Life colors of brown and black (the colors of a Rottweiler or Doberman pinscher).

Dawg Life members advanced in rank by committing acts of violence, which increased the member's reputation within the gang and correspondingly increased the gang's reputation within the community. Members would "put in work" in order to advance. One member testified that "putting in work" meant "shooting, robbing, whatever," and that he was encouraged to shoot a rival gang member because it "might get you a higher rank." One member's brother moved up a rank when he shot someone. Another member stated that an act of violence like a shooting "increases the [member's] position in the gang and they recognize and respect him more." Members could be voted out of the gang if they were not deemed sufficiently violent. One of the witnesses testified he had been voted out of Dawg Life because he "wasn't ready for the funk," defining funk to mean, "like a war or something."

Retaliation also gained a member respect and advancement. Members of Dawg Life lived by the saying "Retaliation is a Must." The gang produced and distributed CDs and tapes to members only, which contained a song entitled "Retaliation is a Must."

Dawg Life also used hand signs to show disrespect to rival gangs or any non-gang persons. One of the threatening signs flashed was O.B.K., meaning "Off Brand Killer." Anyone not from the southeast side was labeled "off brand," and Dawg Life members flashed the sign to warn anyone "off brand" of what the gang might do to them. One witness testified that he was walking with about five friends when

two black males approached them and threw the O.B.K. sign, which, the witness said, was like a warning "right before an enemy about to attack." When one of the black males pulled a handgun and began firing, the witness was shot in the ankle. The same witness was also physically assaulted on another occasion by males who identified themselves as members of Dawg Life.

The gang also used personalized graffiti on rival gangs' territory to show disrespect, such as O.B.K. and "Dawg Life 4 Life."/1 It was not uncommon for Dawg Life and rival gangs to exchange gunfire. Dawg Life members responded violently when rivals spoke badly of them or showed disrespect. Members would either beat up or shoot rivals. Dawg Life members would also assault any non-member who attempted to sell crack from one of their houses.

All members of Dawg Life attended "meeting[s] with a purpose" (clarified as "not just a party"). Discussions at these meetings included obtaining money to purchase cocaine, what would be done to anyone selling cocaine who was not a Dawg Life member, driving out rival drug dealers who were selling in their southeast territory, and the use of particular weapons in shootings.

Stork Shooting of Charlotte Flemming

On August 29, 1997, at approximately 11:30 a.m., a mail carrier was near a home at 1143 Huey Street, which is located on the north side of South Bend within the territory of the Huey Street Posse, one of Dawg Life's rivals. A police officer testified that 1143 Huey was the residence of Leroy and Charles Humbles, members of the Vice Lords/Huey Street Posse gang.

The mailman saw a stranger in the front yard of the home fire several shots in a north-northeasterly direction. Almost immediately after, he saw a car coming from the north corner slow to a near stop in front of 1143 Huey. He then heard two shots being fired and saw the car speed away. One witness stated that he believed the shots were fired from the passenger side of the car. The mailman provided police with a detailed description of the car and a partial license plate number. Moments before the shooting, a high

school student in the area saw someone in the car flash the O.B.K. sign. This student had previously been shot by a Dawg Life member who first flashed the O.B.K. sign at him. The student also recognized the car as belonging to a Dawg Life member. The car was easily identifiable because the body was black with gold rims and had a visible blue primer spot on one door.

Within minutes after the shooting, police saw a car matching the description given by the mailman and began following. After a chase, the car eventually stopped and four occupants fled on foot. Police apprehended two of the occupants, one of whom exited from the front passenger side and was identified as Frank Stork. A .44 caliber,-semi-automatic handgun manufactured in Israel, was recovered from the car. Casings found in the car and on Huey Street were both fired from the .44. Stork, who identified himself as a Dawg Life member, eventually admitted that he had fired the handgun in the direction of the house. He stated that he had heard shots fired and then fired his gun. Dawg Life held a meeting shortly after the shooting and testimony was given that at the meeting Stork discussed the type of gun used for the shooting and the problems he had with firing the gun.

Charlotte Flemming, age 4, was inside the home at 1143 Huey and was injured by metal fragments from the aluminum storm door striking her face when shots penetrated into the house. Two fragments imbedded in her face, one in her cheek and the other above her eye. The fragments were surgically removed but she was left with two permanent scars.

Taylor's Shooting of David Carrell

David Carrell lived on the southeast side of South Bend in Dawg Life territory and testified that he had never been a member of any gang. Carrell had several physical altercations with various gang members due to his refusal to join and was often flashed the O.B.K. sign. Carrell was conversing with Taylor's cousin when Taylor interrupted and began arguing with Carrell. Taylor repeatedly referred to Dawg Life and told Carrell, "[T]his is Dawg Life," and "If you ain't down with the life, you ain't shit." Carrell responded, "Well, whatever, I

don't care what you is." Taylor's final comment was, "I strike when I'm provoked." However, Taylor's cousin testified at trial that he and Taylor were having a conversation when Carrell interrupted them and threw a rival gang sign at them.

Less than two weeks later, when Carrell was returning from the late shift at work, he encountered Taylor after midnight outside of Carrell's home. When Carrell saw Taylor point a gun at him, he ran. Taylor shot and wounded Carrell as he fled. Taylor's cousin testified at trial that he saw Taylor sleeping at his (the cousin's) house on the night of the shooting. However, the cousin had previously told police on the night of the shooting that he had not seen Taylor that night. Both the officer called to the scene and Carrell thought he was fatally wounded. Carrell was transported to the hospital by paramedics. Carrell had surgery and had to wear a colostomy bag for six months. Carrell has since had further corrective surgery.

Wafford's Shooting at David Carrell

Carrell, after having been shot by Taylor in July 1998, was again the subject of another Dawg Life shooting a month later on August 28, 1998. Witnesses identified the house at 1414 South Fellows as a Dawg Life crack house. Carrell lived at his mother's home and spent quite a bit of time at his grandmother's house, which were only two houses apart and located near the intersection of Fellows and Haney, a few houses away from 1414 South Fellows.

On the day in question, Carrell's younger brother overheard a conversation with Wafford and another gang member that Carrell's mother was "snitching." One of the gang members then stated, "You know what we got to do." Carrell's brother found Carrell at his grandmother's house and reported the conversation about their mother. Carrell took a handgun and, with his brother and cousin, went to his mother's home. She was standing on the porch talking to a police officer. As he approached his mother's house, Carrell heard several shots and saw what he believed to be gunfire coming from 1414 South Fellows. Numerous spent casings and several live rounds were later recovered

in and around 1414 South Fellows.

   When Carrell ducked for cover, he fell
and injured himself. After the shots
stopped, Carrell pulled out his gun and
ran towards his mother's house. Although
the police officer on the porch had his
gun drawn at Carrell, the officer
testified that Carrell was visible to him
at all times and he never saw Carrell
fire a shot. The officer believed the
shots had come from 1414 South Fellows,
which he knew was a suspected Dawg Life
crack house. The officer, seeing Carrell
with a gun and blood on him, yelled at
him to drop his weapon. Carrell threw the
gun down and collapsed. He was
transported to the hospital.
   Later that same day, a Dawg Life member
told police that he was with Wafford, his
cousin, that day and that Wafford was the
shooter. Wafford was known to the police
as he had recently stopped a patrol
officer, introduced himself, told the
officer that he knew who the officer was
and asked him to "lighten up on everybody
in the neighborhood." Wafford also told
the officer he was an O.G., with Little
Locs working for him, and asked the
officer to lighten up on the Little Locs.

   Wafford's cousin, who accepted a plea
bargain, provided police with additional
information, including the location of
what he claimed was the weapon used in
the shooting. The police obtained a
search warrant and retrieved a Chinese-
manufactured Norinco SKS assault rifle.
No usable prints were recovered from the
rifle. Because the ammunition casings
were steel, which generally do not leave
ejector marks when discharged, the police
did not test to match the casings to the
rifle as there was only a 10 percent
probability of producing any valid
results.

Dawg Life Crack House at 303 LaPorte
Street

   On January 31, 1996, the South Bend
police served a search warrant at 303
LaPorte Street. During the two weeks
prior to the search, officers spent
fifteen to twenty hours of surveillance
on the house, watching people enter and
leave after brief visits. During this
time period, police observed Jarrode
Phillips standing outside of the house
throughout the week of the raid.

Phillips, a convicted felon, was known to police as a Dawg Life member. On January 25 and 30, undercover police officers made controlled buys of crack cocaine from the house.

Upon entering the house on January 31 at 6:20 a.m., police found Wafford, Phillips, four other gang members, and a woman inside. Phillips was sitting next to another Dawg Life member on a sofa. Underneath the sofa cushion between the two men, police found a .40 caliber Taurus semi-automatic handgun manufactured in Brazil. Both men had immediate access to the weapon. In addition, approximately fourteen white rocks (later tested and found to be crack cocaine), weighing over 33.61 grams, were found on the floor behind the sofa where Phillips was sitting. The police also discovered over $5,000 in cash, baggies, electronic scales, a cellular phone, a pager on Phillips, and Dawg Life written material. Along with ammunition, other weapons found included an assault rifle, a loaded Smith & Wesson revolver manufactured in Massachusetts, a Lorcin semi-automatic handgun manufactured in California, two shotguns, and a Mossberg sawed-off shotgun manufactured in Connecticut. Each of the seized weapons was found to have previously traveled in interstate commerce. The gang members arrested at the house sang Dawg Life rap songs while the police conducted the search. Phillips also stated to the police, "Dawg Life 4 Life."

Dawg Life Crack House at 1115 East Indiana Street

On April 30, 1998, South Bend police officers raided a crack house at 1115 East Indiana Street. The house was identified at trial by a Dawg Life member as a Dawg Life crack house. Police had made controlled purchases of crack cocaine at the house on April 23 and 29. Prior to the raid, police had observed Lamar Taylor standing in front of the house and repeatedly walking up to cars, having a brief conversation, then returning to the house as the cars drove off.

One gang member testified that Phillips lived at 1115 East Indiana; he had his own room there, slept there, had his girlfriend visit him there, and kept his

clothes at the house. Both Phillips and Taylor were present when crack sales took place in the house. Phillips and Taylor were inside when the police arrived. Officers found weapons, ammunition, narcotics, scales, baggies, and 22.63 grams of crack cocaine, along with Dawg Life writings. After his arrest, police observed that Phillips had a "Dawg or Die" tattoo.

A police informant who had been at the house daily for approximately one month prior to the raid testified that only members of the Dawg Life gang were permitted to sell from the house. If an outsider attempted to sell at or near the house, gang members would beat them up and rob the outsider of his crack and his money.

II.  ANALYSIS
A.  Severance

Phillips was the only defendant not charged with committing a violent crime in aid of racketeering. He argues that a joint trial with his three co-defendants, Frank Stork, Armond Stork (Frank's brother), and Lamar Taylor, who were charged with crimes of violence in aid of racketeering involving the use of a dangerous weapon, prejudiced the jury against him and denied him a fair and impartial trial. His pretrial motion to sever and another motion made after the government began to present its case were both denied. However, after evidence against his co-defendants had been presented but immediately prior to the prosecution's case-in-chief against Phillips, the governmentwithdrew its objection to severance but notified Phillips that if the trials were severed, "we may seek additional charges against Mr. Phillips." Phillips' counsel requested additional time to determine whether or not to renew the request as she understood that failure to request severance at that point could mean waiver to any claims of error. Phillips decided to remain as a co-defendant. Phillips now argues that the district court abused its discretion in failing to sever under Fed.R.Crim.P. 8(b) or 14.

"A motion for severance is typically waived if it is not renewed at the close of evidence, primarily because it is then that any prejudice which may have

resulted from the joint trial would be ascertainable." United States v. Caudill, 915 F.2d 294, 298 (7th Cir. 1990) (internal quotations and citation omitted). We noted that, for whatever reason the defendant failed to renew his motion to sever, "[w]e cannot countenance a system in which a defendant first tries to see whether he can get an acquittal in a joint trial, and then when he is convicted renews his motion to sever so that he can have another crack at a jury." United States v. Taglia, 922 F.2d 413, 417 (7th Cir. 1991).

Phillips asserts in his brief that he did not renew his motion for severance because "he should not have been put in that position in the first place," and that "renewing at the end of the government's case would have been futile." However, he fails to substantiate how his renewal would have been futile, particularly given the fact that earlier the district court had specifically inquired if Phillips wished to renew his motion.

Even if Phillips had not waived the issue, his assertion that he was entitled to a separate trial is without merit. In asserting misjoinder under Rule 8(b),/2 there is a presumption that participants in a conspiracy or other criminal schemes should be tried together, "not only to economize on judicial and prosecutorial resources but also to give the jury a fuller picture of the scheme." Taglia, 922 F.2d at 416-17 (citation omitted). Phillips had admitted he was a member of Dawg Life, and evidence further showed that all of his co-defendants were or had been members of Dawg Life. There was also evidence that all of the defendants were involved in either the distribution of or dealing in illegal drugs. Phillips had been arrested along with Taylor at one of the crack houses. There was no error under Rule 8(b).

On a motion for severance under Rule 14,/3 we give great deference to the district court, which is best able to assess the benefits and hazards of a joint trial. Caudill, 915 F. 2d at 298 (citation omitted). A district court's denial of severance will not be disturbed absent an abuse of discretion. United States v. Marshall, 75 F.3d 1097, 1105 (7th Cir. 1996). A defendant must

establish that he suffered "actual prejudice" resulting from the denial of severance. United States v. Pulido, 69 F.3d 192, 207 (7th Cir. 1995) (listing cases). Under the "actual prejudice" standard, a defendant must demonstrate that absent the severance, he was unable to obtain a fair trial. United States v. Magana, 118 F.3d 1173, 1186 (7th Cir. 1997) (citation omitted).

The two Storks and Taylor were charged with a violent crime in aid of racketeering because the government had evidence of those three allegedly having been involved in shootings. There was evidence that all four defendants were involved in an enterprise which dealt in illegal drugs. The district court directed the prosecuting attorneys not to ask any questions of witnesses testifying against the Storks and Taylor that might elicit testimony implicating Phillips and scrupulously reiterated a limiting instruction/4 to remind the jury the testimony could not be used in considering Phillips' charges. See Marshall, 75 F.3d at 1105 (citing United States v. Stillo, 57 F.3d 553, 557 (7th Cir. 1995) (stating that a criminal defendant "must rebut the dual presumptions that a jury will (1) capably sort through the evidence and (2) follow limiting instructions from the court to consider each defendant separately.")). Furthermore, in instructing the jury on Phillips' charges, the district court again gave a limiting instruction:

Even though the defendants are being tried together, you must give each of them separate consideration. In doing this, you must analyze what the evidence shows about each defendant, leaving out of consideration any evidence that was admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law that applies to that defendant.

See Magana, 118 F.3d at 1188. Under circumstances such as these, the Supreme Court noted that our trial system "relies upon the ability of a jury to follow instructions." Opper v. United States, 348 U.S. 84, 95 (1954).

We believe the jury carefully considered the evidence with respect to the

individual counts, finding certain defendants not guilty on particular counts but guilty on other counts and acquitting Armond Stork. See Magana, 118 F.3d at 1189. Phillips has not shown any actual prejudice. We agree with the district court's ruling and find there was no abuse of discretion in denying the motion for severance.

Phillips also argues that if he has waived the severance issue, he is now entitled to plain error review under Fed.R. Crim.P. 52(b), which provides, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." He maintains, "If he had not been on trial with these other gang members . . . he probably would have won his freedom."

Rule 52(b) gives the courts of appeals limited authority to correct errors that a party did not bring to the attention of the district court. United States v. Olano, 507 U.S. 725, 730 (1993). In Olano, the Supreme Court clarified the standard for Rule 52(b) "plain error" review by courts of appeal. The Court distinguished between "forfeited" errors that simply were not timely raised in district court and "waived" errors that were intentionally abandoned or relinquished. Id. at 733 ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'") (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

The Court noted that there must be "error" that is "plain" and that "affect[s] substantial rights." Olano, 507 U.S. at 732. However, the Court stated, "Deviation from a legal rule is 'error' unless the rule has been waived." Id. at 733. Where the legal rule is waivable, a defendant who enters a valid waiver to that right has no claim of "error." Id.; United States v. Penny, 60 F.3d 1257, 1261 (7th Cir. 1995) ("When a right is waived, it is not reviewable, even for plain error."); see United States v. Griffin, 84 F.3d 912, 924 (7th Cir. 1996) ("intentional relinquishment or abandonment of a known right precludes [appellate review]."). The Supreme Court has held the right to trial is waivable.

See Olano, 507 U.S. at 733. We have also held that a defendant may waive the right to counsel free from conflict of interest. See Gomez v. Ahitow, 29 F.3d 1128, 1133 (7th Cir. 1994). As the Court noted in Olano, consideration of whether a right is waivable, whether the defendant participated in the waiver, and whether the defendant's choice is informed or voluntary, is taken into account. 507 U.S. at 733. In this case, after a recess to confer with his lawyer, Phillips' attorney stated that "he's had sufficient time and discussion to make the decision," and Phillips himself agreed that he chose to remain in the case rather than seek severance. His statement constituted a personal, informed, and voluntary waiver. Therefore, the "error" was "extinguished." See id. Phillips' waiver precludes him from raising the issue on appeal. See Griffin, 84 F.3d at 924 (concluding defendant's waiver extinguished his error); United States v. Lakich, 23 F.3d 1203, 1207 (7th Cir. 1994) ("[I]f there has been a valid waiver, there is no 'error' for us to correct."). Phillips is not entitled to raise on appeal the very matter that he told the district court he did not want to raise. See United States v. Davis, 127 F.3d 335, 339 (7th Cir. 1997).

B.   Jury Selection

   Phillips and Taylor objected to the jury array on the ground that none of the approximately forty-eight prospective jurors were African American or Hispanic. The Jury Selection and Service Act of 1968, 28 U.S.C. sec.sec. 1861-78 (1982) ("the Act"), provides, "No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. sec. 1862. A statutory challenge must be made by motion "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C. sec. 1867(a). The motion must also contain "a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title . . . ." 28 U.S.C. sec. 1867(d).

Technically, appellants failed to satisfy both of these procedural prerequisites for a statutory challenge to the jury array. The motion was made orally approximately three-quarters of the way into voir dire. After having interviewed thirty-seven members of the jury panel, with a final group of ten to be brought in, Stork's attorney raised the issue, in which all defense attorneys joined, stating that there were "some serious concerns about the composition of the jury panel." Defendants argue that because the final ten members of the jury panel were "saved back" (not having been brought into the courtroom until the afternoon session), it was not possible to make a sec. 1867 motion until seeing that none of the ten final members were African American or Hispanic. The defendants could have queried the district court about the composition as soon as they saw no African Americans or Hispanics in the first group of venire members; as the statute specifies, the challenge must be made "before the voir dire examination begins . . . ." Although "saving back" a portion of the panel may be an unusual practice, we cannot say the defendants were not alerted to the lack of African Americans or Hispanics with the first group of thirty-seven venire persons.

The second requirement, that of a "sworn statement," was not satisfied as the objections consisted only of counsels' discussion before the judge about the fact that no blacks or Hispanics appeared in the jury pool. Counsel then presented copies of the 1990 U.S. Census Data for each of the eleven counties which comprise the South BendDivision of the Northern District of Indiana, and argued that the non-white population was 8 percent of the total population for the entire South Bend Division. However, counsel specifically challenged the fact that there were no African Americans or Hispanics represented.

Based on the total population of 782,401, the total black population, as indicated in the census material, was 42,847, or approximately 5.4 percent of the total population. There was no separate identification for Hispanic or Spanish descent on the census, but an inclusive category of "Other Race." The

"Other Race" population was 5,566, or .7 percent. Given the fact that we cannot presume the entire "Other Race" category is comprised exclusively of Hispanics, that percentage must be even less. However, having no way to determine the breakdown, for the sake of argument, we will use the entire .7 percent figure, resulting in 6.1 percent, not 8 percent as defendants stated.

Also included in counsel's presentation was a copy of the Amended Jury Selection Plan (1997) for the Northern District of Indiana. The Amended Plan states that names are selected at random from the general election voter registration lists, or, in those counties which do not maintain voter registration lists, from the lists of actual voters. Prior to the Jury Selection Act, most federal districts used the "key man" system, where persons believed to have extensive contacts in the community would suggest names of prospective jurors and the qualified jury wheel would be made up from those names. S. Rep. No. 891, at 10 (1967). This system was thought to foster discrimination. The Act substituted a random selection method from the district or division registered voter or actual voter lists. 28 U.S.C. sec. 1863 (b)(2). As the committee reports state:

If the voter lists are used and supplemented where necessary, and if the procedures outlined in the bill are otherwise rigorously followed, it is no departure from the standards of the legislation that the qualified jury wheel, the venire or array, or the jury itself, may not reflect a community cross section. The act . . . does not require that at any stage beyond the initial source list the selection process shall produce groups that accurately mirror community makeup. Thus, no challenge lies on that basis.

Id. at 17; H.R. Rep. No. 1076, at 5 (1968), reprinted in 1968 U.S.C.C.A.N. 1792, 1794; see also United States v. Koliboski, 732 F.2d 1328, 1331 (7th Cir. 1984) (holding that voter lists are proper source from which to draw a pool of jurors).

The Amended Plan clearly follows the process and procedures recommended by the Act. Defendants' one-page motion, filed

on March 30, 1999, stated that of the forty-eight potential jurors, there was not a single African American or Hispanic. Although accompanied by two exhibits (the 1990 Census Data and the Amended Jury Selection Plan), the motion did not include a sworn statement which "if true, would constitute a substantial failure to comply with the provisions of [the Jury Selection Act]."/5 In fact, the Amended Plan only served to show the district's compliance with provisions and procedures of the Act. Defendants' failure to make a motion in a timely manner and failure to provide evidence, other than oral observations as to the lack of statistical proportionality, precluded a statutory challenge. 28 U.S.C. sec. 1867(e); see United States v. Grose, 525 F.2d 1115, 1119 (7th Cir. 1975). The district court did not err in denying the untimely and substantively inadequate motion. Having failed to comply with thestatutory requirements of sec. 1867(d), the defendants were not entitled to an evidentiary hearing challenging the district's jury selection process. United States v. Percival, 756 F.2d 600, 615 (7th Cir. 1985).

Phillips and Taylor also challenged the jury composition under the Sixth Amendment, which forbids racial discrimination in the selection of jurors. See Taylor v. Louisiana, 419 U.S. 522, 530 (1975). Whether a defendant has been denied the right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which we review de novo. United States v. Raszkiewicz, 169 F.3d 459, 462 (7th Cir. 1999). While the right to a jury trial guarantees the criminal defendant a fair trial by a panel of impartial, "indifferent" jurors, Irwin v. Dowd, 366 U.S. 717, 722 (1961), there is no requirement that a venire or jury mirror the general population. United States v. Duff, 76 F.3d 122, 124 (7th Cir. 1996). "Defendants are not entitled to a jury of any particular composition." Taylor, 419 U.S. at 538. Therefore, "the makeup of any given venire is not significant, provided all rules for selection have been observed." Duff, 76 F.3d at 125 (citing Holland v. Illinois, 493 U.S. 474, 482-83 (1990)).

To make a prima facie case that the fair cross-section requirement has been

violated, a defendant must show that: (1) the group allegedly excluded is a distinctive part of the community, (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. Johnson v. McCaughtry, 92 F.3d 585, 590 (7th Cir. 1996) (citing Duren v. Missouri, 439 U.S. 357, 364 (1979)). There is no dispute that African Americans or Hispanics may constitute a "distinctive part of the community," thereby satisfying the first prong. As to the second prong, defendants argued the jury pool failed to reflect at least 8 percent of the community (although the correct percentage, as discussed previously, was something less than 6.1 percent). In either case, we have noted that "a discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire." United States v. Ashley, 54 F.3d 311, 314 (7th Cir. 1995) (citation omitted). Therefore, defendants fail to satisfy the second requirement.

Defendants also fail to make a showing under the third prong that there was a systematic exclusion of African Americans and Hispanics. See Swain v. Alabama, 380 U.S. 202, 203-04 (1965). Defendants presented evidence of the district's compliance with the proper methods of jury selection yet failed to provide a factual basis for a finding of improper methods of jury selection. "The mere observation that a particular group is underrepresented on a particular panel does not support a constitutional challenge." Grose, 525 F.2d at 1119. The district court did not err in denying defendants' constitutional challenge to the jury selection process.

C.  Sufficiency of Evidence

The defendants challenge the sufficiency of the evidence as to a number of issues. A defendant who attacks the legal sufficiency of the evidence supporting a conviction "faces a nearly insurmountable burden." United States v. Hickok, 77 F.3d 992, 1002 (7th Cir. 1996) (internal quotation and citation omitted). Great

deference is given to the finding of the jury. Penny, 60 F.3d at 1262. The jury's verdict will be overturned "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." United States v. Rosalez-Cortez, 19 F.3d 1210, 1215 (7th Cir. 1994).

1.  Dawg Life as an Enterprise

  Taylor, Stork, and Wafford challenge the sufficiency of the evidence to support their convictions for engaging in an enterprise of racketeering activity. An enterprise is defined as "any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. sec. 1959(b)(2). This definition of enterprise is the same as that used in the RICO Act, 18 U.S.C. sec. 1961(4). See United States v. Rogers, 89 F.3d 1326, 1335 (7th Cir. 1996). Under sec. 1959, the government may prosecute not only conduct under RICO that constitutes a pattern of racketeering activity in connection with an enterprise, but also for violent crimes which, in part, permit a defendant to maintain his position in a RICO enterprise. Id. Therefore, cases decided under sec. 1961(4) may also be used to determine what constitutes an enterprise under sec. 1959. Id.

  For a RICO conviction, the government must prove "both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'" United States v. Turkette, 452 U.S. 576, 583 (1981). As the Court clearly explains,

The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. 18 U.S.C. sec. 1961(1) (1976 ed., Supp. III). The latter is proved by evidence of the requisite number of acts of racketeering

committed by the participants in the enterprise.

Id.

Defendants argue that although there may have been sufficient evidence to show that Dawg Life was "at most a group of people who get together to commit a pattern of racketeering activity. . . . the government was required to present additional evidence to establish beyond a reasonable doubt that this group of people constituted an enterprise." Defendants rely on United States v. Korando, which noted that while the statutory definition of enterprise includes "enterprises that exist solely in order to carry out illegal activity, the enterprise needs to be something more than just the pattern of racketeering activity. Otherwise, two statutory elements--enterprise and pattern--would be collapsed into one." 29 F.3d 1114, 1117 (7th Cir. 1994) (citations omitted).

However, we also stated in Korando that the hallmark of an enterprise is structure, with the enterprise having "a structure and goals separate from the predicate [criminal] acts themselves." 29 F.3d at 1117 (citations omitted). We also noted that RICO applies not only to formal enterprises but to informal ones like criminal gangs. Id.

In this case, the jury instructions defining enterprise and racketeering activity clearly distinguish the elements needed for the two separate charges.

An "enterprise," as that term is used in these instructions, includes any group or individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce. An "enterprise" can include a group of people associated together for a common purpose of engaging in a course of conduct. This group may be associated together for purposes that are both legal and illegal. In considering whether a group is an "enterprise," you should consider whether it has an ongoing organization or structure, either formal or informal, and whether the various members of the group functioned as a continuing unit. The hallmark of an

enterprise is structure; there must be some structure that is amenable to consensual or hierarchical decision-making, though there need not be much. A group may continue to be an "enterprise" even if it changes membership by gaining or losing members over time. The government must prove that the group described in the indictment was the "enterprise" charged, but need not prove each and every allegation in the indictment about the enterprise or the manner in which the enterprise operated.

Final Jury Instructions, p. 9.

"Racketeering activity" includes any act or threat involving robbery, or dealing in a controlled substance. The indictment alleges that the Dawg Life Gang engaged in acts involving robbery in violation of Indiana criminal law, and the felonious manufacture, importation, receiving, concealing, buying, selling or otherwise dealing in controlled substances in violation of federal law. Under Indiana law, robbery consists of the knowing or intentional taking of property from another person or from the presence of another person by using or threatening the use of force on any person, or by putting any person in fear. Federal law prohibits the knowing manufacturing, importing, receiving, concealing, buying, selling, or otherwise dealing in controlled substances. "Manufacture" means to produce or prepare; "import" means that the substance in question was brought from a point outside the United States into the United States.

Final Jury Instructions, p. 10.

Reviewing the evidence in the light most favorable to the government, it is clear from the record, including testimony from admitted Dawg Life gang members, that the government presented more than sufficient evidence that the Dawg Life gang was an enterprise. Dawg Life was a long-established street gang operating on the southeast side of South Bend and was involved in the sale of illegal drugs. It was an ongoing organization with members who functioned as a continuing unit. There was a definite structure with a distinct ranking of members. There was also sufficient evidence for the jury to determine that there was a type of hierarchical decision-making based on

testimony as to one member being voted out the gang, one member being appointed to a higher level, of lower-ranking members going to higher-ranking members for drugs, and of higher-ranking members controlling the pooling of money for lower-ranking members. The continuity of an informal enterprise with differentiated roles amongst the participants provides the necessary "structure" to satisfy the statutory requirements of an enterprise. Korando, 29 F.3d at 1117-18 (citation omitted).

Defendants incorrectly argue that the structure evidence collapsed into the evidence of racketeering activity. As we noted in Rogers, the language of Turkette does not require "the enterprise to have a purpose separate and apart from the pattern of racketeering activity." 89 F.3d at 1336 (emphasis in original) (citing Turkette, 452 U.S. at 583). We held that the Court in Turkette "was merely emphasizing that proof of an enterprise is separate and apart from proof of a pattern of racketeering activity. Thus the two elements are separate and apart, and 'the proof used to establish these separate elements may in particular cases coalesce . . . .'''' Id. (emphasis in original) (citing Turkette, 452 U.S. at 538). "[I]t would be nonsensical to require proof that an enterprise had purposes or goals separate and apart from the pattern of racketeering activity." Id. at 1337. "[T]he fact that a single individual may engage in a pattern of racketeering activity without, of course, comprising an enterprise adequately illustrated the inherent and logical distinction between the two elements." Id.

The district court properly instructed the jury on the elements as to enterprise and racketeering activity; that an enterprise required elements beyond the "racketeering activity" acts of dealing in controlled substances. The evidence was sufficient to allow the jury to find that Dawg Life was "an entity separate and apart from the pattern of activity in which it engages." See Turkette, 452 U.S. at 583.

2. Violent Crimes to Maintain or Increase Position in Enterprise

Taylor, Stork, and Wafford all challenge

the sufficiency of the evidence as to their convictions for the commission of a violent crime in aid of racketeering in violation of 18 U.S.C. sec. 1959, which, in part, provides:

Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual . . . shall be punished . . . .

18 U.S.C. sec. 1959(a).

The basic instruction given to the jury for all three defendants required a finding that (1) the Dawg Life street gang existed and was an enterprise engaged in, or the activities of which affected, interstate or foreign commerce, (2) that the Dawg Life street gang engaged in racketeering activity, (3) that defendant committed a specific violent crime under Indiana law, and (4) that defendant committed the violent crime for the purpose of gaining entrance to or maintaining or increasing position in the Dawg Life street gang. The government is required to prove that the defendant's general purpose in committing the crime of violence was to maintain or increase his position in the criminal enterprise.

There was testimony that the Dawg Life gang was an ongoing enterprise involved in the sale of illegal drugs. The gang operated on principles of violence and that violence was a prerequisite for rewarding and promoting members. There was also testimony that acts of violence were a part of the Dawg Life culture and violence was the expected behavior in order to maintain one's status within the gang.

a. Stork

Stork was charged with committing a battery with a dangerous weapon resulting

in the serious bodily injury of Charlotte Flemming and aiding and abetting in a battery. Witnesses provided evidence that occupants in the car yelled gang "things" and were throwing up O.B.K. signs prior to the shooting. Stork admitted to having fired a handgun in the direction of the house and conceded that gang slogans were shouted, although "they probably came from another car." There was also testimony that Stork had discussed the shooting and his problems with firing the gun at one of the gang meetings.

Given the general testimony as to the importance of violence in Dawg Life, and the specific testimony as to the shooting, there was sufficient evidence for the jury to find beyond a reasonable doubt that the shooting was the type of behavior encouraged and demanded of members of Dawg Life in order to maintain their status within the gang. See Rosalez-Cortez, 19 F.3d at 1215.

b. Taylor

Taylor was charged with committing a battery with a dangerous weapon resulting in the serious bodily injury of David Carrell. The general testimony of gang violence, along with Carrell's identification of Taylor as the shooter, was sufficient for the jury to find beyond a reasonable doubt that Taylor's violent act was part of his behavior as a member of Dawg Life, and that behavior allowed him to, at a minimum, maintain his status within the gang.

c. Wafford

Wafford was charged with committing attempted battery with a dangerous weapon for the attempted shooting of David Carrell. Wafford concedes that he shot at Carrell and does not deny that he was involved in Dawg Life's crack house operations. However, he argues that theevidence did not prove that the purpose of the shooting was to gain entrance to, maintain, or increase his position in Dawg Life. One of the gang members who testified stated that he and Wafford were the shooters and that the Carrell shooting was a "spur of the moment" decision having nothing to do with Dawg Life. He also testified that he believed Carrell had shot at Wafford

sometime in the past but was unable to elaborate.

There was also testimony from one of the police officers who regularly patrolled the southeast side and was familiar with gang activity. The officer explained that he had been very aggressive in making cocaine arrests in the Dawg Life territory and taking people to jail. This officer stated he was stopped by Wafford while on patrol in August of 1998, several weeks before the shooting. He said that Wafford introduced himself and told the officer that Wafford knew who he (the officer) was. The officer stated that Wafford told him he (Wafford) was an O.G., and he wanted the officer to "lighten up on the Little Locs in the neighborhood." (As a high-ranking O.G., Wafford would not usually sell the drugs himself, but would supervise the sales carried out by the lower-ranking members, normally the Little Locs.)

There was sufficient evidence for the jury to find that Wafford believed that Carrell's mother was "snitching" to the police about the crack house, which, testimony showed, was controlled by Dawg Life members, and from which place Wafford supervised crack sales. The jury could reasonably have found that Wafford, as an O.G., was acting to protect and further the Dawg Life enterprise, carrying out his responsibilities as required by his position within the gang.

Basically, all three defendants are asking this court to reweigh the evidence, which we may not do. United States v. Mojica, 984 F.2d 1426, 1435 (7th Cir. 1993) ("It is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses."). As the defendants' sufficiency of the evidence arguments rely on the weight the jury gave to the witnesses' testimony, we find there was sufficient evidence to convict each one of committing a violent crime in order to maintain his position within the criminal enterprise.

3. Maintaining a Crack House

Phillips and Taylor were both convicted of aiding in the maintenance of a crack house in violation of 21 U.S.C. sec. 856/6 and 18 U.S.C. sec. 2./7

There was testimony that Dawg Life controlled at least six known crack houses, including the ones on LaPorte Street and East Indiana Street. Neither defendant disputes the testimony that the houses on LaPorte and East Indiana were crack houses and that illegal drugs were being sold. Phillips argues that he was an innocent bystander who just happened to be at both houses. Taylor argues, at most, he could have been a lookout. Defendants' arguments are without merit. Again, they ask us to reweigh the evidence, which we may not do. See Mojica, 984 F.2d at 1435.

Given the identification that Dawg Life was involved in the sale of illegal drugs, that these were Dawg Life crack houses, that commercial sales had taken place in these houses, see United States v. Church, 970 F.2d 401, 406 (7th Cir. 1992), that Phillips and Taylor were both higher-ranking G. Locs, and that G. Locs were known to supervise the sale of drugs by the lower-ranking Little Locs, there was sufficient evidence for the jury to find guilt beyond a reasonable doubt.

4. Phillips' Possession of a Firearm

Phillips was convicted as a felon in possession of a firearm in violation of 18 U.S.C. sec. 922(g)/8 and now argues there was insufficient evidence to show his possession of any of the firearms seized at the raid on 303 LaPorte Street when he was arrested. To obtain a conviction for felon-in-possession under sec. 922(g)(1), the government must establish beyond a reasonable doubt that (1) the defendant had a previous felony conviction, (2) the defendant possessed a firearm, and (3) the firearm had traveled in or affected interstate commerce. United States v. Walls, 225 F.3d 858, 864 (7th Cir. 2000) (citations omitted). The only element at issue is Phillips' "possession" of a firearm. Possession may be demonstrated by either actual or constructive possession. Id. (citation omitted). Actual possession may be shown by direct physical control of the firearm. Id. Constructive possession occurs when the defendant "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." United States v. Garrett, 903 F.2d 1105, 1110 (7th Cir.

1990) (emphasis and citations omitted).

In fact, the government presented sufficient evidence to show both actual and constructive possession of firearms located at 303 LaPorte. Phillips had direct control of the Taurus handgun found under the cushion next to him on the sofa. He had constructive possession of the other firearms in the sense that he had been observed at the house during the week of the raid and he was a higher-ranking member of Dawg Life at a Dawg Life crack house. Due to Phillips' position in the gang, the jury could reasonably infer that he was in control at the crack house. At a minimum, the government need only show some nexus between the defendant and the guns. See United States v. Hunte, 196 F.3d 687, 692 (7th Cir. 1999) ("a defendant's access to a firearm, even when others also had access, was sufficient to allow a jury to find constructive possession." (citation omitted)).

The district court's jury instruction as to "possession" was proper, reading in part, "Possession of an object is the ability to control it. Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction or control over it, either directly or through others." There was sufficient evidence for the jury to convict Phillips on this charge.

D.   Sentencing Challenge

In the final issue, Stork argues that the district court misinterpreted the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") in applying a six-level enhancement under sec. 2A2.2(b)(3) for "permanent or life-threatening" injuries suffered by Charlotte Flemming. Because Stork is challenging the legal interpretation of the Guidelines, our review is de novo. United States v. White, 222 F.3d 363, 372 (7th Cir. 2000) (citation omitted). The district court's findings of fact are reviewed for clear error. United States v. Griffin, 150 F.3d 778, 787 (7th Cir. 1998) (citation omitted).

Section 2A2.2 for aggravated assault begins with a base offense level of 15. A two-level enhancement is added if the

victim has sustained bodily injury, four levels for serious bodily injury, and six levels for "permanent or life-threatening bodily injury." U.S.S.G. sec. 2A2.2(b)(3). Section 1B1.1, cmt. n.1(j), of the Guidelines defines "serious bodily injury" in pertinent part as an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." Section 1B1.1, cmt. n.1(h), defines "permanent or life-threatening bodily injury" as an "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent."

Stork argues that the term "permanent injury" when linked with "life-threatening" means that the permanent injury "must be of the same magnitude or seriousness as a life-threatening injury," and "the disfigurement must rise to the same level as a substantial impairment of bodily function." He maintains that a four-level enhancement for "serious bodily injury" would have been appropriate. The government argues that the scars are a permanent disfigurement. The district court noted that other cases based on injuries "permanent or life-threatening" have been more serious injuries than Charlotte Flemming's facial scars, see United States v. Jacobs, 167 F.3d 792, 797 (3rd Cir. 1999) (finding that the injuries were both permanent and life-threatening); United States v. Price, 149 F.3d 352, 353-54 (5th Cir. 1998) (finding that there was 10-15% permanent loss of hand function), and that cases based on "serious bodily injury" have involved injuries that might be considered more serious than facial scars, see United States v. Rodgers, 122 F.3d 1129, 1133 (8th Cir. 1997) (finding that post-traumatic stress disorder causing loss of mental faculties and requiring hospitalization was a "serious bodily injury"). However, we agree with the district court's assessment that the issue is not whether other victims have suffered worse injuries but whether Charlotte Flemming suffered "permanent" injuries within the meaning of the

Guidelines. As the Fifth Circuit noted in United States v. Price, "The plain language of application note 1(h) encompasses injuries that may not be terribly severe but are permanent, hence the disjunctive: 'permanent or life-threatening injuries.'" 149 F.3d at 354.

The record provides sufficient evidence that Charlotte Flemming suffered permanent and disfiguring scars on her face, which are obvious to anyone who sees her. There was no clear error in the district court's conclusion that Charlotte suffered a "permanent or life-threatening bodily injury" with an enhancement under sec. 2A2.2(b)(3)(C).

III.  CONCLUSION

For the above-stated reasons, the judgment of the district court is affirmed in all respects.

AFFIRM.


FOOTNOTES

/1   The L is written upside-down to denote disrespect to the rival Lakeside gang.

/2  Rule 8(b) provides:

(b)  Joinder of Defendants.  Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

/3   Rule 14, Relief from Prejudicial Joinder, provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indict-ment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or pro-vide whatever other relief justice re-quires. In ruling on a motion by a defen-dant for severance the court may order the attorney for the government to deliv-er to the court for inspection in camera

any statements or confessions made by the defendants which the government intends to introduce in evidence at trial.

/4 Prior to any testimony not relating to Phillips' charges, the district court informed the jury that "the evidence that you hear [at this time] may not be considered in deciding whether the government has proven its case with respect to Mr. Phillips."

/5 We can only guess that defense counsel thought their discussion in court was the equivalent of a "sworn statement." While it is true that the discussion was recorded and transcribed by the court reporter, no official copy of this discussion nor any affidavit was ever submitted at any time as the mandatory sworn statement required by 28 U.S.C. sec. 1867(d).

/6 21 U.S.C. sec. 856, Establishment of manufacturing operations, provides in part:

(a) Except as authorized by this subchapter, it shall be unlawful to--

(1) knowingly open or maintain any place for the purpose of manufacturing, distributing, or using any controlled substance;

(2) manage or control any building, room, or enclosure, either as an owner, lessee, agent, employee, or mortgagee, and knowingly and intentionally rent, lease, or make available for use, with or without compensation, the building, room, or enclosure for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance.

/7 18 U.S.C. sec. 2, Principals, provides in part, "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Id. sec. 2(a).

/8 18 U.S.C. sec. 922(g) provides in part:

(g) It shall be unlawful for any person--

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

. . .

to ship or transport in interstate or
foreign commerce, or possess in or af-
fecting commerce, any firearm or ammuni-
tion; or to receive any firearm or ammu-
nition which has been shipped or trans-
ported in interstate or foreign commerce.